Filed 11/6/23  P. v. Ramirez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F084555 |
| Plaintiff and Respondent, | (Super. Ct. No. VCF331361B) |
| v. | |
| DANIEL RAMIREZ, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Dina Petrushenko and Clara Madelyn Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**STATEMENT OF THE CASE**

Appellant Daniel Ramirez and his wife Angela were arrested on October 23, 2014, for the murder of their four-month old preemie daughter, Madelyn, but released on October 26, 2014, after no charges were filed.[1]  A grand jury criminal indictment was subsequently filed on February 24, 2016, and both Daniel and Angela were arrested on February 26, 2016.  In the indictment, Daniel and Angela were charged, in count 1, with second degree murder of Madelyn (Pen. Code, § 187, subd. (a))[2] and in count 3 with willful child abuse or endangerment (§ 273a, subd. (a)).  Count 3 further alleged personal infliction of great bodily injury on a child under the age of five (§ 12022.7, subd. (d)), and child endangerment resulting in the death of a minor (§ 12022.95).  Angela was also charged in count 2 with assault on a child under eight years of age resulting in death (§ 273ab, subd. (a)).

Jury trial began in March 2022, and in April, the jury found Daniel and Angela not guilty of murder but guilty of the lesser included offense of involuntary manslaughter (§ 192, subd. (b)).  Daniel and Angela were both found guilty of count 3 felony child abuse. The child endangerment resulting in death enhancement (§ 12022.95) was found true as to both Daniel and Angela; the personal infliction of great bodily injury enhancement (§ 12022.7, subd. (d)) was found true as to Daniel, but not as to Angela.  Angela was acquitted of the charges in count 2, assault on a child resulting in death.

At sentencing on June 10, 2022, Daniel was denied probation and an aggregate prison term of 13 years imposed: the middle term of four years on count 3 (willful child abuse), plus a consecutive midterm of five years for the great bodily injury enhancement and consecutive four years for the child endangerment resulting in death enhancement.  The

---

[1]    We will refer to Daniel and Angela by their first names to avoid confusion, no disrespect is intended.

[2]    All further statutory references are to the Penal Code unless otherwise stated.

middle term of three years was imposed for the involuntary manslaughter conviction and stayed pursuant to section 654.

Daniel was granted credit of 2,285 days actually served plus 342 days of conduct credit pursuant to section 2933.1, for a total of 2,627 days of presentence credit. Fines and fees were imposed.

The matter was referred to the probation officer for an update on presentence credits. On June 15, 2022, the court filed an updated credit calculation recommending 2,302 days of actual time served and 345 days of conduct credit, for a total of 2,647 days presentence credit. `

On appeal Daniel contends his involuntary manslaughter conviction must be reversed due to incorrect jury instructions; the imposition of two enhancements was unauthorized and/or an abuse of discretion; the parole revocation fine is unauthorized; and the abstract of judgment must be corrected to accurately reflect the imposed sentence. We agree only that the abstract of judgment be corrected and in all other respects we affirm.

## STATEMENT OF THE FACTS

### *Background*

Daniel and Angela were married in 2013 and Angela became pregnant soon after. During her pregnancy, Angela developed severe preeclampsia and their daughter Madelyn was born via cesarian section in June of 2014[3], at 31 weeks gestation. At birth, Madelyn was small in size, due to intrauterine growth restriction related to Angela's preeclampsia condition, but she had a healthy Apgar score of eight and nine. She remained in the neonatal intensive care unit (NICU) for 37 days.

While in the NICU, head images, ultrasound, and X-rays showed no hemorrhaging, no undetected subdural hematoma, and no fractured ribs. She was intubated for the first day of life; premature infants have trouble breathing, occasionally stopping for 20 to 30 seconds,

---

[3]     All further dates are for the year 2014 unless otherwise stated.

needing stimulation to prompt breathing. Medication including caffeine was administered to stimulate breathing. The final episode of apnea in the NICU was documented about three weeks after Madelyn was born. NICU nurse Christine Koetsier reviewed potential breathing and behavior changes with Daniel and Angela, who verbalized that they understood.

Madelyn was sent home at the end of July, weighing just shy of four and a half pounds. Daniel and Angela were provided with printed hospital discharge instructions covering infant care, including advice to bring Madelyn to an emergency room if she stopped breathing for a period of time. The instructions explained that, if a young infant temporarily holds their breath due to reflux (called a "preemie grunt"), the baby was to be held face down and given back thrusts, three to five blows firmly between the shoulder blades. Daniel and Angela were also instructed never to shake Madelyn as head trauma can result.

Madelyn was seen for a checkup on August 8, and had gained a bit of weight. Madelyn had been wheezing, and an upper respiratory infection diagnosed, but her oxygen level was appropriate.

Madelyn was seen again on August 13. She had good weight gain, and no neurological or other abnormalities were noted. On August 29, Madelyn weighed six pounds, 12 ounces and her head shape was normal. Her hemoglobin was slightly low.

In early September, Angela attended a bridal shower and Daniel stayed home to care for Madelyn While watching television, Daniel placed Madelyn in her bouncy chair, which collapsed. Daniel reacted by bringing Madelyn close to his body and she either contacted Daniel's knee or knees with her face. Daniel sent Angela a text message and photo of the injury, stating he had "dropped her pretty good," that she had minimal crying, but she did have a red mark on her face. Angela had a text discussion with her sister about the bruise. Her sister asked if Madelyn should be taken to the doctor, but no such visit occurred.

Also, during September, Daniel and Angela made a video showing Daniel "dancing" with Madelyn — placing his hands under Madelyn armpits, which caused her shoulders to shrug. Madelyn's head pitched forward and backward as Daniel physically manipulated Madelyn's body. Daniel and Angela are heard laughing on the video recording. Neither thought Madelyn was in pain while this was happening and they did not think Madelyn was overstimulated by grabbing her leg and flipping her sideways, although acknowledging that, at this point, Madelyn was not able to hold her head up and support her neck on her own.

Angela sent this video to her sister and friends, one of whom forwarded it to Brandon Hankins, a registered nurse. Hankins knew Angela, and he called either Child Protective Services (CPS) or law enforcement and later provided the video to someone from the police department.

During the early morning hours of October 9, Daniel fed Madelyn a bottle. The room was dark as Daniel headed toward the basinet to put Madelyn down. As he was about to lay Madelyn down, Daniel lost control and dropped Madelyn into the bassinet, which made a loud enough noise to wake Angela, who asked what happened.

Daniel explained to Angela that Madelyn had fallen into the bassinet, which was padded. Madelyn cried, but recovered her composure in a few minutes. Daniel checked Madelyn's pupils for sign of concussion, and her head for any lumps, but did not notice anything that caused concern. They stayed awake and watched over Madelyn, but did not feel it necessary to take her to the emergency room. Madelyn ate and behaved normally after the incident.

On October 11, a Saturday, Daniel and Angela took Madelyn to Dr. Bryan Cruz, a pediatrician, for a medical checkup. Their concern was that Madelyn was constipated. Madelyn now weighed nine pounds. No mention was made of the earlier fall. Dr. Cruz performed a physical exam. Madelyn was alert and showed no signs of physical distress, no neurological concerns, nothing suggested traumatic head injury, and no external trauma, scrapes or swelling was observed. Because of the constipation complaint, Dr. Cruz

5.

suggested fluids and exercise, "bicycle maneuvers" of Madelyn's legs, to help with digestive issues. This involved laying Madelyn on her back and moving her legs.

Later in the day, Daniel and Angela attended a Halloween party and took Madelyn along. During the party, Madelyn fell asleep, woke up with a high pitched cry, and fell back asleep. Daniel and Angela took Madelyn home, as she appeared to have shut down as if overwhelmed or overstimulated.

When they got home, Daniel went out for 20 to 30 minutes to make an exchange at a store. The next feeding, at 10:00 p.m., was Daniel's shift, and he thought Madelyn seemed different — she was limp, and when she stopped sucking, he could not get her to start again. Daniel sat Madelyn up, but she remained limp. Daniel flipped Madelyn over and gave her 10 thrusts to her back, but her condition did not change.

Angela came into the room and Daniel asked her to get a Q-tip and he cleared Madelyn's nasal passages. While Madelyn was still nonresponsive, she was no longer limp like before. Daniel told Angela Madelyn had choked. A search history of the MacBook associated with Angela using the Safari browser at 11:00 p.m. that day, revealed an Internet cache image stating, "in loving memory," with a photo of a child.

The next feeding, which was Angela's turn, around 1:00 to 2:00 a.m., Madelyn did not wake to be fed. Daniel and Angela decided to bring Madelyn into bed with them. Her breathing went from unusually distressed to her normal wheezing.

### Madelyn is Taken to the Local Emergency Room

On the morning of October 12, Madelyn continued to sleep and did not wake to be fed. When Daniel picked her up she felt warm with fever. They took Madelyn's temperature, called the triage nurse, and waited for a call back. Angela then called Dr. Cruz's office and stated Madelyn had choked during the night and slept more than normal. Daniel and Angela decided to take Madelyn to the hospital.

At 9:42 a.m., Angela sent a text message to her sister that they were taking Madelyn to the emergency room because her breathing was abnormal, she had been sleeping 12 hours

6.

straight, and was acting lifeless. At 9:51 a.m., Angela texted Daniel's parents that they were on their way to the emergency room because "Madelyn is acting lifeless. Please pray for her. We'll keep you guys updated." Two minutes later, Angela sent another message to Daniel's parents stating, "Let me rephrase my words. Not life less, but just sick. She ha[s] a fever." Angela's message to other friends after they arrived at the emergency room indicated Madelyn must have bumped her head somehow and they did not notice.

Andy Wong, a registered nurse, was on duty when Madelyn arrived at the emergency room at 10:00 a.m. Kaweah Delta Hospital. The initial complaint by Daniel and Angela was that Madelyn had had a choking incident around 10:00 p.m. the previous night, had been sleeping more than usual, and was not acting normal. Madelyn had a temperature of 102.8 degrees Fahrenheit, and her pulse and respiratory rate were higher than normal. Within a few minutes, after realizing Madelyn was nonresponsive, Madelyn's status was changed to urgent and a doctor summoned. Neither Daniel nor Angela told the nurse that Madelyn had stopped breathing the night before.

Emergency room physician Dr. John Hipskind examined Madelyn and found her breathing but unresponsive. The fontanel soft spot on the top of Madelyn's head was bulging, indicating increased intracranial pressure due to swelling in the skull. Madelyn's pupils were dilated, another symptom of increased intra cranial pressure. Madelyn was intubated and hooked to a breathing machine. A CAT scan revealed a left occipital skull fracture, diffused cerebral edema, left subdural hematoma, and transtentorial herniation.

Radiologist Dr. Glade Roper was unable to differentiate between the gray and white matter on an X-ray of Madelyn's head, indicating her brain was severely injured and swollen. Dr. Roper opined that Madelyn's skull was fractured into the occipital bone, and the images indicated Madelyn suffered blunt trauma to the head.

Dr. Hipskind found the history provided by Daniel — about the fall from a short distance during feeding four nights previous — as inconsistent with the severity of Madelyn's injuries. He also opined that the delay of eight or nine hours between symptom

onset and seeking medical treatment, raised the question of nonaccidental trauma. Dr. Hipskind decided to transfer Madelyn, who was in critical condition and at risk of dying, to Valley Children's Hospital, where she was helicoptered at approximately 1:45 p.m.

*Madelyn is Transferred to Valley Children's Hospital*

Daniel and Angela were driven to Valley Children's Hospital by Daniel's parents. Enroute, at 2:17 p.m. Angela texted a friend that Madelyn "[s]omehow she must have hit her head," but had "[n]o idea when it happened." At 2:24 p.m., Angela's MacBook was accessed to search for funerals, burials, obituaries, and "newborn infant's obituary."

Madelyn arrived at Valley Children's Hospital unconscious and was examined by Dr. Thianchai Bunnalai, a pediatric intensive care physician. Daniel told Dr. Bunnalai that Madelyn had been dropped into a bassinet on October 9, a fall of around one and one-half feet, and that she experienced a choking incident and was not breathing well on October 11. He did not mention that Madelyn had stopped breathing. After Dr. Bunnalai spoke to "another person," he went back to talk to Daniel again, who then acknowledged Madelyn had stopped breathing.

At 5:21 p.m., Angela texted Lorene that "Daniel accidentally dropped Madelyn like four days ago." Angela also texted Veronica that Madelyn "isn't going to make it. Daniel dropped her four days ago," and although Madelyn had seemed fine then, she was not.

Dr. Bunnalai called a neurologist, pediatric neurosurgeon Dr. Ashely Tian, and a pediatric trauma surgeon for assistance, as Madelyn's clinical picture of blunt trauma to the head and brain swelling was not explained by the short fall Daniel described. Dr. Tian noted a full nonaccidental trauma workup was required, and Dr. Bunnalai called child abuse specialist, Dr. Philip Hyden.

Dr. Hyden noted that Madelyn did not react to touch and her eyes did not respond to light or stimulus. Dr. Hyden saw no signs of external trauma, but Madelyn's fontanel was protruding upwards. Dr. Hyden recommended a full skeletal survey to check for other fractures, as well as an ophthalmology evaluation.

8.

Ophthalmologist Dr. Mehdi Ghajarnia examined Madelyn  Classic indicators of a nonaccidental trauma are multilayered hemorrhage in the retina, as are extensive hemorrhages.  Dr. Ghajarnia found a few intraretinal hemorrhages in Madelyn  Dr. Ghajarnia found the limited finding suspicious but not conclusive.  Dr. Ghajarnia opined that Madelyn was less likely the victim of shaken baby trauma as opposed to impact trauma, but could not conclude with absolute certainty that Madelyn was not subjected to nonaccidental trauma, or classic shaken baby syndrome, causing the limited retinal bleeding he saw.

Radiologist Dr. Michael Myracle performed an MRI on Madelyn's brain and spine, which was read by pediatric radiologist Dr. Fred Laningham.  The images showed Madelyn's brain to be very swollen with poor blood flow.  Dr. Laningham opined that the injury occurred within the past three days.

Dr. Myracle could not exclude the possibility that the subdural hematoma was several days old.  Dr. Myracle opined that it would be reasonable to assume that the skull fracture and brain injury were caused simultaneously.

Dr. Myracle also did a chest X-ray of Madelyn and found several rib fractures, which Dr. Myracle opined had occurred a minimum of 10 days prior to examination and could have occurred at the same time, or could have involved up to three separate events.

Dr. Myracle and Dr. Laningham also found evidence of corner fractures or bucket-handle fractures, which are classic "metaphyseal lesion[s] of child abuse."  Dr. Myracle found corner fractures on both sides of Madelyn's knee joints, thigh bones, and shin bones. The most likely mechanism for knee fractures would be to grab the lower legs and move the knees forcefully.  Dr. Myracle thought there was probably another fracture on one of the ankles, but was not certain, citing the presence of periosteal healing.

Medical experts at Valley Children's Hospital decided surgery would be futile, due to Madelyn's extensive injuries.  Her brain tissue was swollen to the extent that it pushed down

through the brain stem, which compressed the respiratory center and stopped breathing. Compression also stopped blood circulation.

*Madelyn's Death and Autopsies*

Madelyn was pronounced dead on October 16 at 12:44 p.m. after life support was removed. An initial autopsy of Madelyn was conducted on October 20 by Dr. Walter. Robert Douglas, an identification technologist, was present at the autopsy and observed that, when Madelyn's head was opened, there was visible blood inside. A second pathologist, Dr. Evan Matshes, was later consulted after Dr. Walter passed away.

Dr. Matshes had concerns about the conclusions drawn from Dr. Walter's autopsy. While Dr. Walter had concluded there were no rib fractures, Dr. Matshes viewed the photos of Madelyn's ribs and found three healing rib fractures. Because the original microscopic slides, tissues harvested during autopsy used to make those slides, and the autopsy X-rays had been inadvertently destroyed. Madelyn's remains were exhumed for a second autopsy.

The second autopsy was performed on January 21, 2022, by Dr. Matshes and Dr. Madeleine Hinkes, a forensic anthropologist. The two healing rib fractures towards the back of the right side of Madelyn's body, observed from the 2014 photos, were not able to be confirmed during the second autopsy due to the degraded bones. Medical evidence made Dr. Matshes highly suspicious of corner fractures, but he could not confirm them since the remains were too degraded. Prior images, however, were suggestive of corner fractures and were concerning, as they are a strong indicator of child abuse.

Dr. Matshes determined Madelyn died from blunt force head trauma. While Dr. Matshes could not rule out the possibility that Madelyn's bassinet fall caused her brain injury, it was not likely.

Dr. Matshes concluded that Madelyn's subdural hematoma evolved over time, as documented by the CAT scan and initial autopsy. Madelyn suffered at least one traumatic episode and, based on other injuries, Dr. Matshes could not rule out two or three distinct episodes. Dr. Matshes described the video of Madelyn being manipulated (dancing) as very

10.

rough handling, and could not rule out that this caused some of Madelyn's injuries. Dr. Matshes did not find evidence of a skull fracture, but could not rule it out entirely due to the condition of the remains.

Dr. Myracle was aware of the disputed finding of skull fracture from the second autopsy, but had no doubt about his diagnosis of a skull fracture. He believed the subdural hematoma and herniating of the brain caused Madelyn's death.

*Child Abuse Expert*

Dr. Hyden spoke to Daniel on October 14, and was told that, on October 9, Daniel dropped Madelyn into her bassinet from one and one-half feet, heard a noise, and thought Madelyn struck her head on the bassinet. Daniel picked Madelyn up, she cried briefly, was consoled and appeared fine. Dr. Hyden was told Madelyn stopped breathing the night before she was taken to the hospital on October 12. When Madelyn stopped breathing, Daniel had administered 10 blows to Madelyn's back.

Dr. Hyden opined that it was significant that Madelyn's fractures were healing because it takes several days to see nondisplaced rib fractures on X-rays, and an injury cannot be seen until new bone has formed around the fracture. Dr. Hyden opined that all of Madelyn's rib fractures were 10 to 14 days old, and another fractured rib may have been older. Dr. Hyden had never seen rib fractures caused by back thrusts or blows, as described by Daniel.

The metaphysical fractures to both Madelyn's knees and one of her ankles were concerning to Dr. Hyden, as they are caused by grasping the bone and pulling or jerking, inconsistent with normal handling and could have been caused by the "bicycling" activity described by Daniel, which Dr. Hyden described as reckless and dangerous. Dr. Hyden reviewed the video of Daniel "dancing" with Madelyn and described the activity as "reckless" with "no regard" for Madelyn's safety.

Because of the inconsistencies in Daniel's version of the events, Dr. Hyden did not believe Daniel. Dr. Hyden noted that, while Daniel said he dropped Madelyn into her

11.

bassinet, there was a video recording demonstrating how Daniel hit the wall while holding Madelyn and she then fell into the bassinet. Dr. Hyden did not believe a skull fracture like Madelyn's could result without someone being violent to her head, and the skull fracture and corner fractures pointed to child abuse.

Dr. Hyden opined that a subdural hematoma could occur without a skull fracture, and that the subdural hematoma was likely caused by vigorous shaking. Dr. Hyden did not believe a simple fall into the bassinet could cause the subdural hematoma and traumatic brain injury in this case. Dr. Hyden opined that, if Madelyn was a little fussy before the nonbreathing event on Saturday, then the head trauma happened shortly beforehand. If Madelyn's injury was caused by the drop into the bassinet, she would not have been able to feed normally as reported for the few days following. Dr. Hyden believed the fatal head injury occurred just before Madelyn became lifeless in appearance.

Dr. Hyden's opinion that Madelyn was battered would not change even if there was no skull fracture, as she died of major brain trauma. Dr. Hyden concluded that Madelyn suffered from an "accelerated/decelerated shaking event with a slam that caused vessels to be ruptured to cause the inside of the brain to become diffused." Dr. Hyden opined that Madelyn suffered from abusive nonaccidental head trauma.

Pediatrician and child abuse specialist Dr. Frederic Bruhn was consulted on Madelyn's case. He watched the video reenactment in which Daniel demonstrated the back blows he gave Madelyn and his dropping Madelyn into the bassinet, and he watched the video of Daniel "dancing" with Madelyn Dr. Bruhn observed the September 7 photo of Madelyn's bruise under her left eye, the explanation for which was that Madelyn fell out of a chair. Dr. Bruhn opined that, had he seen the eye, he would have performed an investigation into abuse, as two-month-olds do not usually have black eyes. Dr. Bruhn opined that some of the actions in the "dancing" video could have caused the corner fractures. Dr. Bruhn was even more concerned about Daniel's demonstration of "bicycling."

12.

According to Dr. Bruhn, when a subdural hematoma occurs, a baby will often stop breathing and that is when the damage is done. While the initial history was that Madelyn slipped out of Daniel's hands three to four days before she arrived at the hospital, that did not explain her condition when she did arrive. In addition, the history of choking did not explain the head injury. And, according to Dr. Bruhn, back thrusts do not produce skull fractures and brain injury. Dr. Bruhn also did not think that the rib fractures were caused by the back blows.

Dr. Bruhn opined that it would be very unusual for a short fall to result in serious brain injury to a child, and the fall, as described, would not have resulted in severe head injury and Madelyn would not have acted well if that had been the case. Dr. Bruhn was aware of Dr. Tian's thought that Madelyn's subdural hematoma was likely caused by the fall into the bassinet.

Dr. Bruhn opined that Madelyn's brain injury likely happened around 10:00 p.m., the night before she was taken to the emergency room. According to Dr. Bruhn, Madelyn should have been taken to the emergency room immediately, and most parents would do so without delay if the child stopped breathing for two to three minutes. Dr. Bruhn did not think any treatment Madelyn received at the hospital contributed to her death, and nothing could have been done to save her by the time she arrived at the hospital.

*Child Abuse Investigation*

On October 12, Police Officer Joshua Pena contacted Brandon Hankins, who had sent the "dancing" video by e-mail to Officer Pena. After he spoke to nurse Hankins, Officer Pena went to Valley Children's Hospital to interview Angela and Daniel. Both agreed to talk to Officer Pena. Officer Pena interviewed Angela first and then Daniel.

The audio recording of Officer Pena's interview with Angela was played for the jury. In it, Angela described the fall into the bassinet on Wednesday or Thursday night, that Madelyn cried for two minutes, seemed fine, and went back to sleep. The day before, October 11, Madelyn was taken to the emergency room and seen by a doctor with a

13.

complaint of gas and constipation. Madelyn was examined and found not to have any injury. That night, Madelyn did not want her bottle. Her breathing between 10:00 p.m. and 4:00 a.m. sounded as if she had phlegm in her throat, which Angela described as a "preemie grunt."

Angela thought that because Madelyn was a preemie, she had been overstimulated during the day, and that that, along with her excessive crying and being in pain from gas, caused Madelyn's body to shut down and sleep. At 4:00 a.m., when Madelyn flailed her arms, Angela assumed she was hungry and prepared a bottle, but Madelyn would not take it. Angela and Daniel stayed awake to watch Madelyn and became concerned when she continued to sleep and developed a fever. The following morning, Madelyn was "lifeless, not moving and she slept 12 hours." Her temperature was 100 degrees in the morning.

The audio recording of Officer Pena's interview with Daniel was also played for the jury. In it, Daniel described the incident when he accidently fumbled while putting Madelyn into her bassinet, dropping her as it was too dark to see. Madelyn cried for a few minutes, they checked her for injuries, and she seemed fine and acted normal for the next two days. However, according to Daniel, Madelyn started "acting weird" on October 11 and they took her to the doctor thinking she was in pain due to intestinal gas. But the results of the examination were that she was fine.

Daniel and Angela took Madelyn to a Halloween party at 4:00 p.m. and she seemed fine. When she started to cry, they took her home. At 7:00 p.m., thinking she was struggling with gas, Daniel did "baby yoga" with her and she finished a bottle he gave her. According to Daniel, at the 10:00 p.m. feeding "kind of the same thing happened," and mid-feeding, Madelyn went "lifeless" and was not breathing. Daniel turned her around and gave her back thrusts, but she still was not breathing. She resumed breathing after Daniel swabbed her nostrils. Daniel thought Madelyn had not been breathing for two or three minutes.

14.

Daniel stated they did not take her to the hospital at that time because she had had an episode "exactly like this" three to four weeks earlier and the doctor had said it was a "preemie thing" and normal for them to stop and then restart breathing. When Madelyn's breathing became more normal, Angela and Daniel assumed she was feeling better. The decision to take Madelyn to the emergency room was made after "it went … on too long," and she had been sleeping for 12 hours and her body temperature had risen rapidly.

Officer Pena thought it significant that Daniel had said Madelyn stopped breathing for two or three minutes, which seemed a long time, and he relayed this information to Dr. Bunnalai. Dr. Bunnalai then recontacted Daniel and Angela to find out why the information about Madelyn not breathing had been omitted, which Daniel subsequently confirmed.

At 9:33 p.m. on October 12, Angela texted Lorene that they were being investigated by "CPS police officers." She sent the same text to Sabrina Quair. Two minutes later, Angela texted her sister April that Daniel's father was angry because they had not mentioned that Madelyn had been dropped and he asked whether they were certain they never did "anything else to her."

Officer Pena returned to Valley Children's Hospital on October 15 for further investigation. Both Angela and Daniel were there, and Officer Pena asked that each write a timeline of events from October 8 through the present. Angela's timeline stated that Madelyn stopped eating on Saturday, October 11, between 9:00 and 10:00 p.m. and they figured she was "overstimulated." When it was time to feed her at 4:00 a.m. the next morning, Madelyn was awake but would not eat. She woke Daniel and told him "M seemed a little weird." They thought she must be exhausted and decided to let her rest. They did an Internet search and concluded it was a viral infection or pneumonia. Angela called the NICU at around 10:00 a.m., but ultimately they decided to take Madelyn to the emergency room. Angela also described an earlier breathing incident and thought it was normal for a premature infant, but they eventually called the NICU.

Daniel's timeline described Madelyn not breathing and giving her back thrusts and clearing her nasal passage. Daniel stated that this had happened before and were told preemie babies sometimes have these episodes and "kind of shut off for a few hours and have irregular breathing during that time." Daniel explained that, although they were told it was normal, they were concerned and took Madelyn to the doctor the following day where she was examined, found to be normal, and sent home. On October 11, they believed Madelyn was having another episode and watched her closely, but after eight hours, thought it might be pneumonia and decided to take her to the emergency room.

Officer Pena next contacted Daniel and Angela October 22. They came to the police station at Officer Pena's request and interviews were again recorded and played for the jury.

Daniel again described the earlier episode of not breathing, after which Madelyn was examined by a doctor and told not to worry. He assumed the event of October 11 was a similar episode.

Another video was taken of Daniel reenacting (with a doll) his bicycle exercise with Madelyn and demonstrating the back thrusts he used on Madelyn Angela watched the video of Daniel demonstrating the bicycling, but said she never saw Daniel move Madelyn's legs that fast.

In her interview, Angela stated that she had postpartum anxiety and experienced panic attacks. She was seeing obstetrician and gynecologist Dr. Elizabeth Enderton for help. Angela and Daniel did not say anything to Dr. Cruz about the fall into the bassinet because Madelyn seemed fine after the incident. Angela believed Madelyn's injuries were due to the fall into the bassinet, which she was assured was an accident, and they should have taken her to the emergency room at that time.

Angela stated that she did not see Madelyn stop breathing Saturday night, but was told by Daniel it had been for a couple of minutes and he administered back thrusts. He asked her to go get some Q-tips to help clear Madelyn's throat. She then said Daniel had told her Madelyn had choked, but did not mention Madelyn not breathing Angela recalled

16.

that Madelyn had stopped breathing a couple of weeks after they brought her home. They took her to the doctor's office, but were told it was normal for premature infants to have interrupted breathing. Angela stated that she and Daniel did not take Madelyn to the doctor right away after the last episode because they believed she was exhibiting normal behavior for premature infants.

*Defense*

Ophthalmologist Dr. Mehdi Ghajarnia, who worked at the California Eye Institute, was consulted to look for retinal hemorrhaging in Madelyn on October 12. Multilayered retinal hemorrhaging is a classic sign of nonaccidental trauma. When Dr. Ghajarnia examined Madelyn, she had "limited intraretinal hemorrhages."

Dr. Enderton testified that Angela attended all her prenatal appointments. She suffered from severe preeclampsia, which required early delivery at 31 weeks. According to Dr. Enderton, a fetus's lungs are the last of the body functions to develop and breathing was a concern for premature infants. Dr. Enderton testified that postpartum depression manifests itself in the first six weeks after delivery and includes symptoms of feeling hopeless, not being able to care for oneself, excessive sleeping, and either eating too much or not at all. Dr. Enderton saw Angela on July 10, talked to her about postpartum depression and referred her to a social worker.

Clinical psychologist Brandon Foster saw Angela on August 14. At the time, Angela reported anxiety and catastrophic thoughts, and had excessive worries. Dr. Foster testified that Angela had good judgment, her thought processes were intact, and she had low aggression and high anger control. Dr. Foster's notes stated, "current suicidality vague, with no plans, or intent." Dr. Foster had no concern about Angela's impulse control.

Dr. Foster saw Angela on August 21 for anxiety. At the time she had minimal depression, her agitation and aggression were long and her control was high. Angela did not come to an August 28 appointment, called to say she was feeling better and did not reschedule.

17.

*Daniel's Testimony*

Daniel testified that, at some point in Angela's pregnancy, he quit his job since she needed constant care due to preeclampsia. Daniel testified she was at "high risk for a heart attack or stroke." Daniel explained that they moved in with his parents because their apartment had an issue with second-hand smoke and other noxious odors that gave him headaches.

Daniel testified that doctors determined that Angela would need a cesarean section early or it would result in the death of the child. After Madelyn came home from the NICU, Daniel talked to doctors and nurses about "bicycling," which he described as moving Madelyn's legs and moving her legs "knees-to-chest" to "alleviate gas." Daniel testified that Madelyn had an "apnea episode" while in the NICU, which Daniel claimed the hospital told them "was normal," and she would have episodes where she might stop breathing for a "few seconds." Daniel recalled such an episode a week after they brought Madelyn home. He described the episode as her "shutting down" but it did not involve "any non-breathing."

Daniel described the video of him "dancing" with Madelyn as something seen on America's Funniest Home Videos. Daniel described having fun with Madelyn and Angela, who was holding the camera.

As for the incident in which Madelyn fell against his knee, Daniel testified that was the first time he watched Madelyn by himself for a significant amount of time. He was watching television and Madelyn, was in her bouncy chair next to him. When he tried to lift Madelyn from the chair, it collapsed in on itself. He then brought Madelyn's body close to his and she received a "little mark on her eye" which developed into a bruise the next day. It was gone the day following.

Daniel testified that during Madelyn's three-and-a half month life, they took her to the doctor six times, each time with gastrointestinal issues. Each time they were told Madelyn's "liveliness" would eventually come. Daniel acknowledged that they had been

18.

told of a "vast list of problems associated with preemies and when you should bring them into the ER."

Daniel described Madelyn's "drop in the bassinet" as occurring during a feeding with Madelyn. He described getting up to put Madelyn in her bassinet after swaddling her. The room was dark. He had her on his right shoulder and started to put her down before she was near the bassinet and ended up "fumbling her" a split second where he lost control. Madelyn landed in the bassinet, and he picked her up "quickly." She cried for a few minutes and then stopped. Daniel described the event as "alarming," but not something he would rush off to the emergency room for. Daniel and Angela paid attention to Madelyn the remainder of the night. She was awake often, but Daniel did not see her pupils dilated or constricting and there was no lump on her head.

Daniel described giving Madelyn "back blows" on October 11. He was feeding Madelyn and she went limp. He turned her around and laid her across his leg and gave her 10 back blows "with some force." When Angela came into the room, he asked her for Q-tips to swab her nose. Daniel was not sure Madelyn was not breathing during the two- to three-minute episode and insisted that he never said in "any of the interrogations" that she was not breathing, only that it appeared like it. Daniel and Angela continued to check on Madelyn and she seemed to be better. But Daniel described Madelyn as being "shut down," longer than the two previous episodes and she would not wake to be fed. Her temperature appeared normal at first, but went up. Angela called the NICU but was told not to bring her in yet. But after checking her temperature again, they decided to take her to the emergency room.

*Angela's Testimony*

Angela testified that she was elated when she got pregnant, but began suffering from nausea about a month into the pregnancy. She had severe migraine headaches, which felt like a hammer hitting her head. Her body was swollen and was put on a magnesium strip to prevent a stroke or seizure. Angela was sick after Madelyn was delivered by cesarean

19.

section. Her blood pressure was so high she could not leave her hospital room and she was not able to see Madelyn for three or four days. Angela felt detached from Madelyn, when she was born, and this feeling persisted until Madelyn was released from the NICU.

Angela's depression lifted when Madelyn was discharged, but she experienced anxiety about a week or two later. She had read about women who thought their child was Satan, and she did not want to end up like that. She developed irrational fears and imagined babies being cooked in microwaves and stoves. Angela told her health care providers about her anxiety. Zoloft was prescribed but increased her anxiety. When the dosage was adjusted, her anxiety remained, but her irrational fears went away. She still occasionally had a panic attack and difficulty sleeping, but there was never a time when she could not provide for Madelyn. Angela testified that Daniel would never hurt Madelyn.

Angela did not believe there was anything wrong with Madelyn when they were getting ready for the Halloween party on October 11. Madelyn did not eat after the party, but Angela thought she had been overstimulated. Madelyn did not appear to be in distress when Daniel asked her to retrieve the Q-tips. The next morning, Madelyn appeared to be sleeping and Angela thought she was okay. Angela went outside with the dog for a few minutes and when she came inside she picked Madelyn up. She was warm and Angela and Daniel decided to take her to the emergency room. While at the hospital, Angela thought the only possible explanation for Madelyn's injuries was the bassinet fall. Daniel had not yet said anything to her about Madelyn not breathing.

## DISCUSSION

I.  WAS THERE INSTRUCTIONAL ERROR ON INVOLUNTARY MANSLAUGHTER?

Daniel was charged with second degree murder, of which he was acquitted, and was convicted instead of involuntary manslaughter. On appeal, Daniel contends his conviction for involuntary manslaughter must be reversed due to instructional error. Daniel contends that, in finding him guilty of involuntary manslaughter, the jury was incorrectly not required

20.

to find a nexus between his *failure to act* (seeking medical care for Madelyn when under a duty to act) and any criminal negligence.  As argued by Daniel,

> "There was no instruction requiring a joint operation of *failure to act* and criminal negligence.  Given the prosecutor's theory that the defendants were guilty of homicide based on their failure to act, the instructions allowed the jury to take the easiest route to a guilty verdict for involuntary manslaughter as a strict-liability offense."

Respondent argues Daniel has forfeited his right to challenge the jury instruction by failing to object at trial.[4]  Respondents further argue no error occurred and, even assuming error, the instructions given on involuntary manslaughter was harmless.  Regardless, we address the issue on the merits and find no instructional error.

*Standard of Review*

An appellate court may review any instruction given, refused, or modified even though no objection was made in the trial court if the substantial rights of the defendant are affected thereby.  (§ 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.)  When a defendant claims a jury instruction was erroneous or inadequate, " 'we evaluate the instructions as a whole, not in isolation.' "  (*People v. Nelson* (2016) 1 Cal.5th 513, 544.)  The test is " 'whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of the trial, and the arguments of counsel.' "  (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370.)  We review de novo whether jury instructions correctly state the law.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

---

[4]     During trial, the prosecutor submitted proposed instructions to the trial court; the defense did not submit any proposed instructions.  During two jury instruction hearings, defense counsel voiced no objection to the instructions, including the instruction on involuntary manslaughter.

*Duty to Instruct*

The trial court has a sua sponte duty to instruct on the principles of law that are relevant to and govern the case, including instruction on all of the elements of the offense. (*People v. Magee* (2003) 107 Cal.App.4th 188, 193.) This duty includes the obligation to instruct on "every supportable theory of the lesser included offense .…" (*People v. Breverman* (1998) 19 Cal.4th 142, 149, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 255–256.)

*Involuntary Manslaughter*

Section 192, subdivision (b) defines involuntary manslaughter as an unlawful killing occurring during the commission of "an unlawful act, not amounting to a felony;[5] or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection [i.e., criminally negligence]." Section 192 has been interpreted to encompass an unintentional killing occurring during the commission of a noninherently dangerous felony when committed without due caution or circumspection. (*People v. Burroughs* (1984) 35 Cal.3d 824, 835.)

Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.) The governing mens rea for involuntary manslaughter is criminal negligence. (*Id.* at p. 1007; *People v. Wells* (1996) 12 Cal.4th 979, 983.) Criminal negligence exists when a defendant engages in conduct that is "such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances...." (*People v. Penny* (1955) 44 Cal.2d 861, 879.)

*Daniel's Claim on Instructions Given*

The trial court instructed the jury on the elements of second degree murder, pursuant to CALCRIM No. 520, in terms of committing an act *or failing to act* with express or

---

**5**    Misdemeanor child abuse (sometimes referred to a child endangerment) under section 273a, subdivision (b) is such an "unlawful act."

22.

implied malice. The instruction further informed the jurors "[a] parent has the legal duty to furnish medical attendance for his or her child."

The jury was instructed, pursuant to CALCRIM No. 580, on involuntary manslaughter as a lesser included offense of murder, but, as argued by Daniel "only in terms of an affirmative crime or lawful acts performed with criminal negligence," and not as a *failure to act.* That instruction provided, in relevant part:

> "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. [¶] An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is murder. [¶] An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter. [¶] The defendant committed involuntary manslaughter if: [¶] One, the defendant *committed a crime* or a *lawful act* in an unlawful manner; [¶] Two, the defendant committed the crime or act with criminal negligence; [¶] And three, the defendant's acts caused the death of another person."

CALCRIM No. 580 further instructed that criminal negligence:

> "involves more than ordinary carelessness, inattention, or mistake in judgment. [¶] A person acts with criminal negligence when: [¶] One, he or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] And two, a reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act."

The instruction further alleged that Daniel committed the crimes of child endangerment (abuse), simple assault, and simple battery with criminal negligence, and that the jury "may not find defendant guilty [of involuntary manslaughter] unless all of you agree that the People have proved that the defendant committed at least one of these alleged

23.

acts and you all agree that the same act or acts were proved." And, as argued by Daniel, the instructions on simple battery (CALCRIM No. 960), simple assault (CALCRIM No. 915), and child abuse/endangerment (CALCRIM No. 823), which were given, are all based on an affirmative act rather than a failure to act.

Daniel argues further that CALCRIM No. 252, which instructed on the union of act and intent, provided that, in order to find murder, the defendant must "not only intentionally commit the prohibited act *or intentionally fail to do the required act,* but must do so with a specific intent and/or mental state." But for the crime of involuntary manslaughter, the same instruction required only the union of "[t]he act and specific intent and/or mental state."

Thus, as argued by Daniel, none of the instructions, as given, "required connecting a *failure to act* with any criminal negligence." We disagree for two reasons.

*Applicable Law and Analysis*

*1. Daniel was convicted of a crime with criminal negligence.*

CALCRIM No. 580 lists the elements of involuntary manslaughter: (1) defendant *committed a crime* or a lawful act in an unlawful manner; (2) with criminal negligence; and (3) which caused the death of another. This instruction referred to three possible crimes, including section 273a(b) Misdemeanor Child Abuse/Endangerment, CALCRIM No. 823. The elements of this crime are (1) the defendant, while having care or custody of a child, willfully caused *or permitted the child's person or health to be injured;* and (2) defendant was criminally negligent when he or she caused or permitted the child to be injured. This definition of child abuse criminalizes the allegations that Daniel was criminally negligent in failing to seek medical care for Madelyn.

*2. The jury was properly instructed on involuntary manslaughter as a lessor included offense of murder.*

Generally, "when an individual's criminal liability is based on the *failure* to act, it is well established that he or she must first be under an existing legal duty to take positive

24.

action." (*People v. Heitzman* (1994) 9 Cal.4th 189, 197.)  "A parent owes his or her child a duty to obtain needed medical attention." (*People v. Latham* (2012) 203 Cal.App.4th 319, 327; § 270 [making it a crime for parents to fail to furnish necessary medical attendance].)

For additional reasons, we find that the jury was properly instructed with the pattern instructions for second degree murder and involuntary manslaughter as a lesser included offense.  (CALCRIM Nos. 520, 580.)  There are two different sets of jury instructions for involuntary manslaughter.  One is given, as it was here, when the offense is a lesser included offense of a murder charge (CALCRIM No. 580).  The other, not applicable nor given here, is to be given when murder is not charged (CALCRIM Nos. 581, 582).[6]

When properly read in conjunction, CALCRIM Nos. 520 and 580 correctly instructed that "[a]n act or a failure to act causes death only if it is a substantial factor in causing the death."  (CALCRIM No. 520.)  CALCRIM No. 520 further instructed that "A parent has a legal duty to care for their child.  A parent has a legal duty to furnish necessary medical attendance for his or her child."

The jury was also instructed that involuntary manslaughter requires a finding that a defendant acted with criminal negligence (CALCRIM Nos. 252, 580).  And, the jury was specifically instructed, pursuant to CALCRIM No. 3406B, on criminal negligence as it was tied to a "theory of failing to provide medical care" as the required mental state for involuntary manslaughter.  CALCRIM No. 3406B instructed:

> "The defendant is not guilty of the following crimes *on a theory of failing to provide medical care* if he or she did not have the intent or mental state

---

[6]      Here, if murder was not charged, the trial court would instead give the instruction for "Involuntary Manslaughter: Failure to Perform a Legal Duty" (CALCRIM No. 582). See, e.g., *People v. Villalobos* (1962) 208 Cal.App.2d 321, 323–324, in which the defendant was charged with involuntary manslaughter after pouring scalding water over a child and waiting five or six hours before taking the child to the hospital, resulting in the child's death.  The conviction was upheld, and the *Villalobos* court stated, "The failure to use due care in the treatment of another where a duty to furnish such care exists is sufficient to constitute that form of manslaughter which results from an act of omission." (*Villalobos, supra,* at p. 329.)

25.

required to commit the crime because he or she reasonably did not know a fact or reasonably and mistakenly believed a fact: *involuntary manslaughter* … or child abuse. [¶] If the defendant's conduct would have been lawful under the facts as he or she reasonably believed them to be, he or she did not commit the above crimes *on a theory of failing to provide medical care*. [¶] If you find that the defendant believed that Madelyn did not need immediate medical care and if you find that belief was reasonable, he or she did not have the specific intent or mental state required for the above crimes *on a theory of failing to provide medical care*. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for involuntary manslaughter … or child abuse, you must find him/her not guilty of those crimes."

Contrary to Daniel's assertion, the jury instructions consistently referred to the commission of the alleged crimes as either affirmative or passive conduct, thereby equating the terms "act," "failure to act," "omission," and "failure to perform a legal duty." For instance, in CALCRIM No. 240, the instruction on causation, the jury was instructed that "An *act or omission* causes injury or death if the injury or death is the direct, natural, and probable consequence of the act or omission and the injury or death would not have happened without the act or omission." (See also "commit the prohibited act or failed to do the required act" (CALCRIM No. 252); "act," "failed to perform [a legal] duty", "act or failure to act" (CALCRIM NO. 520); "crime or act" (CALCRIM No. 580); "acted or failed to act" (CALCRIM No. 3404); commission of crime based on "failing to provide medical care" (CALCRIM No. 3406B); referring to alleged crimes as "these acts" (CALCRIM No. 3500).)

And the jury was correctly instructed on the concept of criminal negligence and that it could not convict of involuntary manslaughter without finding criminal negligence. (CALCRIM Nos. 252, 580, 821, 823).

"[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." (*Cupp v. Naughten* (1973) 414 U.S. 141, 146-147.) Viewing the instruction given here together, the jury reasonably understood the concept of "act," "failure to act," and "failure to perform a parent duty" applied equally to

involuntary manslaughter, and required a finding of criminal negligence. The jury was specifically instructed, pursuant to CALCRIM No. 200, to "[p]ay careful attention to all of the[] instructions and consider them together."

Daniel argues that, while the prosecutor's focus in closing was on a failure to act — seeking medical attention — it was argued entirely in the context of urging the jury to find guilt on the charge of murder under a theory of implied malice. Certainly, the prosecutor was hoping for a conviction of second degree murder and concentrated on that theory. However, in closing argument, the prosecutor also correctly explained that "[t]he general principles that apply to this case is that a parent has a legal duty to care for their child. If you conclude that one of the accused … owed a duty to Madelyn and that they failed to perform that duty, his failure or her failure to act is the same as if they had done the act themselves." The prosecutor argued that either Daniel or Angela "acted and one of them failed to act," and equated failure to act with the failure to perform a parental duty, stating:

> "When you have a legal duty to protect a child, you cannot simply stand by while that child is harmed or dying and say I didn't do it. The failure to act in that circumstance is the same as inflicting the injury yourself. You have a duty to protect. You have a duty to intervene. You have a duty to provide care."

The prosecutor further stated that "the defendants are guilty for failing to provide the medical care that Madelyn so desperately needed on Saturday night," as "[t]hey both knew that Madelyn was critically ill and needed immediate medical care." The prosecutor argued that Daniel was "guilt[y] o[f] a failure to act" for failing to provide medical care in the 12 hours after Madelyn's body was "lifeless." The prosecutor further discussed the definition of criminal negligence and that involuntary manslaughter "requires criminal negligence." The prosecutor closed by stating:

"There are two independent bases of culpability in this case. The defendants can be guilty for direct infliction of injury, but they are equally guilty for failure to act.[7] [¶] The second basis is the simple one to reach … regardless of how the injuries occurred…. [T]he defendants are guilty for failing to provide medical care that Madelyn so desperately needed on Saturday night."

We find no instructional error. The jury was given a clear and complete view of the legal theories applicable to this case, which included commission of involuntary manslaughter by child abuse/endangerment with criminal negligence, and the failure to use due care in the treatment of another, and it could accurately determine whether Daniel's failure to act constituted criminal negligence in light of the instructions given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["jurors are presumed able to understand and correlate instructions"]; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1182 [instructions are to be considered as a whole and not in isolation].)

## II.     IS DANIEL'S SENTENCE UNAUTHORIZED?

The trial court imposed two enhancements attached to the term for count 3, felony child abuse in violation of section 273a. The trial court imposed the middle term of five years for personally inflicting great bodily injury on a child under the age of five (§ 12022.7, subd. (d)), plus four years for engaging in child endangerment under circumstances resulting in death (§ 12022.95). Daniel argues that, under the recent amendment to section 1385, the trial court was required to dismiss one of the two enhancements at sentencing, and failure to do so resulted in an unauthorized sentence. He also argues, in the alternative, that the trial court abused its discretion in sentencing on the two enhancements. Daniel acknowledges that, if the sentence is unauthorized, the trial court retains discretion to correct the judgment by choosing which of the two enhancements — for four years or five — to dismiss. Respondent argues that under the current language of section 1385, subdivision (c), the trial

---

[7]     The jury agreed, finding both Daniel and Angela guilty of felony child abuse and finding true the enhancement for failing to summon medical aid resulting in Madelyn's death.

28.

court retains its discretion to impose more than one enhancement. Respondent argues further that Daniel forfeited his second argument and that, in any case, no abuse of discretion occurred.

*Background*

In its presentencing report, the probation department recounted that the abuse of Madelyn "occurred over a period of three months," resulting in multiple rib fractures and a skull fracture. Probation recommended Daniel be sentenced to a total of 16 years, consisting of the upper term of six years on count 3, plus the upper term of six years on the section 12022.7, subdivision (d) enhancement, and four years on the section 12022.95 enhancement, "as the injuries resulted in [Madelyn]'s death." The report stated Madelyn,

> "sustained multiple injuries including multiple rib fractures on both sides of her body, corner fractures on both sides of her distal femur, and her right tibia was fractured, in addition to her skull being fractured; and being [Madelyn] was an infant, she was immobile and unable to request assistance or communicate what was occurring."

Prior to sentencing, Daniel's counsel filed a statement in mitigation. Counsel asked that the trial court take into consideration several factors listed in California Rules of Court, rule 4.423, circumstances in mitigation, namely: (3) that the crime was committed under an unusual circumstance, not likely to recur; (4) that the criminal conduct was partially excusable not amounting to a defense, due to lack of … knowledge and experience; and (7) that Daniel mistakenly believed his conduct was not a criminal offense, but rather " 'playfully rough.' " Counsel asked that the great bodily injury enhancement (§ 12022.7, subd. (d)), be either stayed or imposed concurrently to the enhancement for child abuse resulting in death (§ 12022.95).

At sentencing, Daniel's counsel submitted on the brief, arguing the above mentioned factors in mitigation, namely that this was "an unusual case," and that Daniel and Angela were "convicted on failing to do certain things that better judgment would have dictated," and "no intent was ever shown that either one of these parents intended to harm the baby —

29.

knowingly harm the baby."  The trial court noted Daniel's counsel had not filed a motion for a new trial, "so the jury's verdict stands."

The prosecutor argued that probation was correct in finding that Madelyn suffered "multiple injuries that were sustained over a lengthy period of time."  She further stated:

> "[T]here are two special allegations GBI which is under 12022.7, which could have been established by multiple different injuries that Madelyn received throughout her life.  The allegation under 12022.95 alleges a violation that results in … death.  [¶] … I do believe that the evidence established based on the multiple healing fractures, the leg fractures, the femur fractures, the ankle fracture, as well as the consecutive sentencing regarding the two special allegations as to Count 3 .…"

The trial court then asked Daniel's counsel if he had any further comment "having to do with this legal issue."  Counsel stated he did not and thought the trial court "covered it."

In imposing sentence, the trial court stated:

> "In Count 3 [Daniel] is committed to state prison for the middle term of four years, plus an additional and consecutive term of five years pursuant to Penal Code Section 12022.7, plus an additional and consecutive four years pursuant to Penal Code Section 12022.95.  [¶]  The Court agrees with the analysis submitted by the prosecutor.  The great bodily injury enhancement properly goes to the multiple injuries inflicted in this case other than death, and the special allegation under Penal Code Section 12022.95 goes to the final incident causing the child's death.  So, the Court believes that it is appropriately sentencing [Daniel] individually and consecutively for each one of those enhancements."

*Does Senate Bill No. 81 Eliminate the Trial Court's Discretion to Impose Two Sentencing Enhancements?*

We next address Daniel's claim that Senate Bill No. 81 eliminated the trial court's discretion to impose two sentencing enhancements.

Prior to January 1, 2022, section 1385 provided trial courts with discretion to dismiss sentencing enhancements in the interest of justice.  The statute did not provide direction as to how courts should exercise that discretion.  In October 2021 the Legislature passed and the Governor signed Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1)

30.

(Senate Bill 81), which, effective January 1, 2022, amended section 1385 to provide guidance regarding the exercise of discretion in dismissing sentencing enhancements.

Section 1385, subdivision (c), now provides in part, "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."

The mitigating circumstance relevant here provides, "(B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B).)

Daniel argues use of the word "shall" in section 1385, subdivision (c)(2)(B), required the trial court to dismiss one of the two sentencing enhancements. Daniel argues the trial court erred as a matter of law in imposing the sentence for both the five-year personal infliction of great bodily injury to a child under the age of five enhancement (§ 12022.7, subd. (d)) and the four-year engaging in child endangerment under circumstances resulting in death enhancement (§ 12022.95).[8]

The issue Daniel posits is currently under review by our Supreme Court. We take our analysis on this issue from three cases currently under review — *People v. Walker* (2022) 86 Cal.App.5th 386, review granted March 22, 2023 (S278309); *People v. Anderson*

---

[8] Daniel did not make this argument in the trial court. However, because his interpretation of section 1385, if correct, would result in an unauthorized sentence (see *People v. Scott* (1994) 9 Cal.4th 331, 354 [sentence violating mandatory provisions is unauthorized]), the issue is not subject to forfeiture. (*People v. Cabrera* (2018) 21 Cal.App.5th 470, 477.)

(2023) 88 Cal.App.5th 233, review granted April 19, 2023 (S278786); and *People v. Ortiz* (2023) 87 Cal.App.5th 1087, review granted April 12, 2023 (S278894).

If we were to read section 1385, subdivision (c)(2)(B), in isolation, then Daniel's argument would appear correct — use of the term "shall" in a statute is generally mandatory, not permissive. However, "we are not permitted to pluck this phrase out of its placement in the statute and consider it in isolation; instead, we are required to consider where it fits into the ' " 'context of the statute as a whole.' " ' " (*People v. Walker, supra,* 86 Cal.App.5th at p. 396.) Here, the statement that a court "shall" dismiss certain enhancements appears as a subpart to the general provision that a "court shall dismiss an enhancement *if* it is in the furtherance of justice to do so." (§ 1385, subd. (c)(1), italics added.) In other words, the dismissal of the enhancement is conditioned on a trial court's finding dismissal is in the interest of justice.

The nature of this condition is further explained by the Legislature's directive that the court, while "exercising its discretion under this subdivision, ... shall consider and afford great weight" to evidence of certain factors, and proof of one of the factors "weighs greatly" in favor of dismissal "unless" the court finds dismissal would endanger public safety. (§ 1385, subd. (c)(2).) "This language, taken together, explicitly and unambiguously establishes: the trial court has discretion to dismiss sentencing enhancements; certain circumstances weigh greatly in favor of dismissal; and a finding of danger to public safety can overcome the circumstances in favor of dismissal." (*People v. Anderson, supra,* 88 Cal.App.5th at p. 239.)

It is within these boundaries that section 1385 states the court "shall" dismiss all but one enhancement. The dismissal *shall* occur but only *if,* in exercising its discretion and giving great weight to certain factors, the court finds dismissal is in the interests of justice or would not endanger public safety. As stated in *People v. Walker, supra,* 86 Cal.App.5th at page 397, in reaching the same conclusion, if we were to read subdivision (c)(2)(B) as mandatory, then the existence of those factors "would not 'weigh greatly' in favor of

dismissal — it would weigh *dispositively*." Furthermore, "[t]hat construction would also require us to accept that our Legislature … opted to embed that mandate as an addendum to one of nine mitigating factors to be given great weight in the context of a trial court's discretionary decision whether to dismiss. In other words, if our Legislature was trying to implement a rule of mandatory and automatic dismissal, it picked a very circuitous way to do so." (*Walker, supra,* at p. 398.)

In *People v. Anderson,* the appellate court reasoned that the legislative history of Senate Bill 81 further supported the interpretation that dismissal of the enhancements is not mandatory. As explained in *People v. Anderson*:

> "The initial drafts of the bill stated, 'There shall be a presumption that it is in the furtherance of justice to dismiss an enhancement upon a finding that any of the circumstances in subparagraphs (A) to (I), inclusive, are true. This presumption shall only be overcome by a showing of clear and convincing evidence that dismissal of the enhancement would endanger public safety.' (Sen. Amend. to Sen. Bill No. 81 (2021-2022 Reg. Sess.) Apr. 27, 2021.) However, the Assembly removed the presumption requiring clear and convincing evidence to overcome, replacing it with the more flexible discretionary language that now appears in section 1385, subdivision (c)(2). (See Assem. Amend. to Senate Bill No. 81 (2021-2022 Reg. Sess.) August 30, 2021.) Shortly thereafter, in a letter to the Secretary of the Senate that was placed by unanimous consent in the Senate Journal, the author of Senate Bill 81 stated, 'I respectfully request the following letter be printed in the Senate Daily Journal expressing our intent with respect to this measure: [¶] ... [¶] [A]mendments taken on Aug. 30, 2021 remove the presumption that a judge must rule to dismiss a sentence enhancement if certain circumstances are present, and instead replace[s] that presumption with a "great weight" standard where these circumstances are present. The retention of the word 'shall' in Penal Code § 1385 (c)(3)(B) and (C)[9] should not be read as a retention of the previous presumption language—the judge's discretion is preserved.' (Sen. Nancy Skinner, letter to Sect. of the Sen. (Sept. 10, 2021) 121 Sen. J. (2021-2022 Reg. Sess.) p. 2638.)" (*People v. Anderson, supra,* 88 Cal.App.5th at p. 240, fn. omitted.)

---

[9] The version of section 1385 effective January 1, 2022, included mitigating circumstances (A) through (I) within subdivision (c)(3). (Stats. 2021, ch. 771, § 1.) Effective June 30, 2022, the mitigating circumstances are listed in subdivision (c)(2).

As further explained in *People v. Anderson,* "not only did the Legislature remove the presumption in favor of dismissal, instead explicitly stating the court had discretion to dismiss enhancements, but also the author of Senate Bill 81 anticipated the precise argument [appellant] raises — that the word 'shall' in section 1385, subdivision (c)(2)(B) …could be misconstrued as a mandate to automatically dismiss applicable enhancements." (*People v. Anderson, supra,* 88 Cal.App.5th at pp. 240–241.) We agree further with the court in *People v. Anderson* (*ibid.*), that the author's unambiguous rejection of this interpretation, placed in the official record with the unanimous consent of her colleagues, supports the conclusion that a trial court is not required to dismiss all but one enhancement, but rather that the trial court has discretion in deciding whether to do so.[10]

### *Did the Trial Court Abuse its Discretion in Declining to Dismiss One of the Sentence Enhancements?*

As addressed, *ante*, amended section 1385 specifies "factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.) The amended statute lists nine mitigating circumstances, including the one applicable here — the existence of multiple enhancements in a single case. "In exercising discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the

---

**10**      While the statements of individual legislators may not be entitled to great weight in determining legislative intent (see *People v. Ramos* (1996) 50 Cal.App.4th 810, 821), a legislator's statement is entitled to consideration when it gives some indication of arguments made to the Legislature and adoption of proposed amendments. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700.)

enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).)

Daniel argues, in the alternative to his preceding argument, that the trial court abused its discretion when it did not sua sponte dismiss one of the enhancements at sentencing. Daniel contends, if this court concludes *People v. Walker, supra,* 86 Cal.App.5th 386 is correctly decided, that *Walker* also clarified that subdivision (c)(2)(B) of section 1385 "created a rebut[able] presumption weighing in favor of striking one of the enhancements unless the court finds that would endanger public safety." Daniel asks that we remand with directions to strike one of the enhancements because the trial court abused its discretion, "either because any implicit finding of dangerousness is not supported by the record or by failing to understand the obligation to dismiss a strike unless the court found doing so would endanger public safety." Respondent contends Daniel forfeited this claim by failing to object below and that, in any event, the claim fails on the merits.

We find forfeiture occurred, but address the issue on the merits as well.

*Forfeiture*

As discussed, *ante,* at sentencing in the trial court, not only did Daniel's counsel not ask that one of the enhancements be stricken, counsel suggested two other alternatives: either that the great bodily injury enhancement (§ 12022.7, subd. (d)), be stayed or imposed concurrently to the enhancement for child abuse resulting in death (§ 12022.95).

Accordingly, Daniel has forfeited the argument the trial court erred by failing to articulate certain reasons for imposing both enhancements and by relying on improper factors to do so. (See *People v. Velasquez* (2007) 152 Cal.App.4th 1503, 1511 ["by failing to object, Velasquez has forfeited his claim the upper terms are improper because the trial court did not state its reasons for selecting those terms"]; see also *People v. Scott, supra,* 9 Cal.4th 331 at p. 353 ["waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"].) So long as the parties are clearly apprised of the sentence and the reasons supporting the choices, and were

35.

given a meaningful opportunity to object, the failure to lodge an objection to a trial court's sentencing choices at the hearing constitutes a forfeiture of the issue on appeal. (*Id.* at p. 356.)

In addition, the general rule is that a trial court is presumed to have been aware of and followed the applicable law, a rule that is applicable to judicial exercise at sentencing as well. (*People v. Mosely* (1997) 53 Cal.App.4th 489, 496-497, and cases cited therein.) In this case, the applicable law went into effect January 1, 2022, and trial took place six months later in June of 2022.

### *Abuse of Discretion*

Daniel appears to argue that the mitigating factor here — the presence of more than one enhancement — warrants a presumption in favor of dismissal that could only be rebutted by a showing that dismissal would endanger public safety. As noted above, Daniel contends that, if this court concludes *People v. Walker, supra,* 86 Cal.App.5th 386 is correctly decided, *Walker* also clarified that subdivision (c)(2)(B) of section 1385 created a rebut[able] presumption weighing in favor of striking one of the enhancements unless the court finds that would endanger public safety. We disagree with Daniel's construction of section 1385, subdivision (c)(2)(B), as recently addressed in *People v. Ortiz, supra,* 87 Cal.App.5th 1087, in which the defendant made a similar argument to the one made here.

In order to address the issue, we go back to the legislative history of the amended statute. As addressed, at length, in *Ortiz*:

> "The plain language of section 1385(c)(2) contemplates the trial court's exercise of sentencing discretion, even as it mandates that the court give 'great weight' to evidence of enumerated factors. The legislative history of Senate Bill 81 reflects that this was no accident: the language of section 1385 (c)(2) as enacted replaced proposed language that would have mandated 'a presumption that it is in the furtherance of justice to dismiss an enhancement' that could only 'be overcome by a showing of clear and convincing evidence that dismissal of the enhancement would endanger public safety.' (See Sen. Bill No. 81 as amended Aug. 30, 2021; see also Sen. Rules Com., Off. of Sen. Floor Analysis, analysis of Sen. Bill No. 81 (2021-2022 Reg. Sess.) as

amended Aug. 30, 2021, at p. 2 [reflecting that Assembly amendments to Sen. Bill No. 81 '[r]emove[d] the presumption that it is in the interests of justice to dismiss an enhancement when specified circumstances are found to be true and instead provide[ ] that the court shall, in exercising its discretion to dismiss an enhancement in the interests of justice, consider and afford great weight to evidence of those specified circumstances'].) Had the Legislature intended to establish a rebuttable presumption as [appellant] posits, it could have approved the language of the earlier version of the bill. We are unable to ignore the fact that it did not." (*Ortiz, supra,* 87 Cal.App.5th at pp. 1096-1097.)

The language of section 1385, subdivision (c)(2) as ultimately enacted reflects a legislative recognition that a trial court's exercise of sentencing discretion involves more than a strictly binary weighing of mitigation against public safety. "[G]enerally applicable sentencing principles" relevant to a court's determination of whether dismissal is in furtherance of justice "relat[e] to matters such as the defendant's background, character, and prospects." (See *People v. Williams* (1998) 17 Cal.4th 148, 160, fn. omitted.) Those principles require consideration of circumstances in mitigation (and aggravation) in the broader context of the recognized objectives of sentencing, which are not limited to public safety. (See Cal. Rules of Court, rule 4.410.)

We agree that the court in *Walker* adopted the construction urged by Daniel. The *Walker* court observed that (1) the "court '*shall* dismiss an enhancement if it is in the furtherance of justice to do so,' " subject to an inapplicable exception (*Walker, supra,* 86 Cal.App.5th at p. 398); (2) "the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances" set forth in the statute are present (§ 1385, subd. (c)(2); see *Walker, supra, a*t p. 398); and (3) "[p]roof of the presence of one or more of" the mitigating circumstances " '*weighs greatly* in favor of the enhancement ... *unless* the court finds that dismissal of the enhancement would endanger public safety' " (§ 1385, subd. (c)(2); *Walker, supra,* at p. 398.) From this, the *Walker* court concluded that the statute as a whole "places a thumb on the scale that balances the mitigating circumstances favoring dismissal against whether dismissal would endanger

37.

public safety, and tips that balance in favor of dismissal unless rebutted by the court's finding that dismissal would endanger public safety." (*Walker, supra,* at pp. 398–400.)

Although we agree that section 1385, subdivision (c)(2)(B) seeks to "fine tune" the trial court's exercise of discretion (*Walker, supra,* 86 Cal.App.5th at p. 395), we respectfully decline to follow *Walker* in its more formalistic reading of the provision. Instead, we agree with *Ortiz* that the ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement. To be sure, the Legislature has invested the enumerated mitigating circumstances with great weight, both in the trial court's evaluation of the defendant's evidence in the first instance and in the trial court's consideration of the mitigating circumstance once established. But this does not preclude a trial court from determining that countervailing factors — other than the likelihood of physical or other serious danger to others — may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice. If we interpret the statute as the *Walker* court does (see *Walker, supra,* at pp. 391, 399), to require the trial court to dismiss an enhancement absent a finding that dismissal would endanger public safety would divest the trial court of its ultimate discretion under the statute to determine what is in furtherance of justice, considering all relevant factors.

As discussed above, the *Walker* court's construction of the statute echoes the prior iterations of Senate Bill 81 which we have noted were superseded by amendment in the Assembly prior to enactment—the rebuttable presumption contemplated in the prior version of the statute was replaced with language that expressly acknowledged a trial court's exercise of "discretion" under section 1385, subdivision (c). (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 81 (2021-2022 Reg. Sess.) as amended Aug. 30, 2021, at p. 2; Sen. Bill No. 81 (2021-2022 Reg. Sess.) as amended Apr. 27, 2021.) This legislative history only bolsters our reading of the statutory text.

Because section 1385, subdivision (c)(2), expressly states that when weighing whether to dismiss an enhancement, the trial court's task amounts to "exercising its discretion," the abuse of discretion standard of review applies. (*People v. Carmony* (2004) 33 Cal.4th 367, 373.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts: First ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination ... will not be set aside on review" ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree...." ' Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra,* 33 Cal.4th at pp. 376–377.)

We find no abuse of discretion on the part of the trial court in sentencing Daniel on both enhancements. In assessing Daniel's request to either stay or run concurrent one of the enhancements, the trial court was apprised of the factors in mitigation put forth by counsel, but determined that other factors were collectively weightier. In doing so, the trial court acted within its discretion. (See generally *Carmony, supra,* 33 Cal.4th at pp. 376–377.)

III.     IS THE PAROLE REVOCATION FINE UNAUTHORIZED?

At sentencing, the trial court ordered a restitution fine in the amount of $1,000 pursuant to section 1202.4, and further imposed and suspended a parole revocation restitution fine in the amount of $9,600 pursuant to section 1202.45. Daniel contends the parole revocation restitution fine must be reduced to $1,000 as the two fines must, as required by statute, be in the same amount.

Respondent disagrees that the trial court erred in imposing the parole revocation restitution fine. Instead, respondent argues that the record suggests that the trial court misspoke when it imposed the $1,000 restitution fine.

39.

We will remand for clarification.

*Background*

Prior to sentencing, the probation department recommended that the trial court order Daniel pay a $9,600 restitution fine (§ 1202.4) and an identical $9,600 parole revocation restitution fine (§ 1202.45). The probation department further recommended that Daniel be ordered to pay a $1,000 restitution fine pursuant to section 294, subdivision (a), based on his conviction in count 3.

In the minute order for sentencing and the abstract of judgment, the trial court followed probation's recommendation, which both state that Daniel pay a $9,600 restitution fine (§ 1202.4), a $9,600 parole revocation restitution fine (§ 1202.45), and a $1,000 restitution fine (§ 294, subd. (a)).

However, in its oral pronouncement, the trial court stated:

> "[Daniel] is ordered to pay a restitution fine in the amount of $1,000 pursuant to Section 1202.4 of the Penal Code, and pay a restitution fine in the amount of $1,000 under Section 294(a) of the Penal Code. [¶] The defendant is to pay a parole revocation restitution fine in the amount of $9,600 pursuant to Section 1202.45 of the Penal Code, but that is suspended pending successful completion of parole."

*Applicable Law and Analysis*

In every case where a person is convicted of a crime, a trial court is required to impose a restitution fine and a suspended parole revocation restitution fine in the same amount, between $300 and $10,000, unless it finds compelling and extraordinary reasons not to do so. (§§ 1202.4, subd. (b), 1202.45, subd. (a).) Here, the oral pronouncement of the fines states two different amounts were imposed.

"As a general rule, when there is a discrepancy between the minute order and the oral pronouncement of judgment, the oral pronouncement controls." (*People v. Contreras* (2015) 237 Cal.App.4th 868, 880; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385-390.) The California Supreme Court has also stated that "a record that is in conflict will be

40.

harmonized if possible," but if the reporter's transcript and the clerk's transcript — the minute order in this case — cannot be reconciled, we do not automatically defer to the reporter's transcript, but rather adopt the transcript that should be given greater credence under the circumstances of the particular case. (*People v. Harrison* (2005) 35 Cal.4th 208, 226, citing *People v. Smith* (1983) 33 Cal.3d 596, 599; see also *People v. Pirali* (2013) 217 Cal.App.4th 1341, 1346.)

Here, the trial court, at sentencing, stated that it had read and considered the probation report, and it appears that the trial court was attempting to follow probation's recommendation and impose a $9,600 restitution fine. However, because the restitution fine and the parole revocation restitution fine are required to be the same amount and that did not happen here, the trial court's intention is unclear. Moreover, because the matter must be remanded to correct the abstract of judgment (see part IV., *post*), we believe it is appropriate to remand the case for the trial court to clarify what fines were imposed, and to modify the judgment and abstract of judgment accordingly.

IV.    CORRECTING THE ABSTRACT OF JUDGMENT

Lastly, Daniel contends that there are various clerical errors in the abstract of judgment that require correction. We address each contention separately.

### *Punishment for Count 3*

Count 3, child abuse or endangerment, was selected as the principal term, and the trial court imposed the middle term of four years. The abstract of judgment does not include the term selected for count 3 and reflects that the term for count 3 is stayed pursuant to section 654. Respondent concedes the error must be corrected. We remand with directions to correct the abstract of judgment to reflect the trial court's selection of count 3 as the principal term, and imposition of the middle term of four years on that count.

*Punishment for Count 1*

As to count 1, involuntary manslaughter, the middle term of three years was stayed pursuant to section 654. However, the abstract of judgment states that the count 1 conviction was punished by an unstayed term of four years. Respondent concedes the error, and we will remand with directions to correct the abstract of judgment to reflect a stayed three-year term for count 1.

*Designation of Count 1 as a Strike*

The count 1 conviction for involuntary manslaughter is listed on the abstract of judgment as a "serious" and "violent" felony offense. The three-strikes law provides harsher punishment when a defendant has prior serious or violent felony "strike" convictions. (§ 1170.12.) While voluntary manslaughter is a "serious felony" under section 1192.7, subdivision (c)(1), and thus qualifies as a strike, involuntary manslaughter is not considered to be a "violent or "serious" felony, and thus does not qualify as a strike. (§§ 667.5, subd. (c), 1192.7, subd. (c); *People v. Skiles* (2011) 51 Cal.4th 1178, 1183, fn. 1.; see also *People v. Denard* (2015) 242 Cal.App.4th 1012, 1027.) Respondent concedes that the corrections should be made to the abstract of judgment. We remand for the trial court to omit reference to the count 1 conviction as either serious or violent.

*Enhancements Attached to Count 1*

The trial court imposed two enhancements attached to the term for count 3, the middle term of five years under section 12022.7 and four years pursuant to section 12022.95. However, the abstract of judgment lists these as attached to count 1. In part II., *ante*, we found no error in the imposition of both enhancements. We agree with respondent that the abstract of judgment must be corrected to reflect that both enhancements are attached to count 3, not count 1.

*Amount of Restitution Fine*

Oral pronouncement of the section 1202.4 fine was in the amount of $1,000 and the section 1202.45 parole revocation restitution fine in the mount of $9,600, but the abstract of

42.

judgment lists both as $9,600.  Daniel argues that the abstract of judgment must be corrected to properly reflect imposition of the $1,000 restitution fine (§ 1202.4) and a statutorily mandated $1,000 corresponding parole revocation restitution fine (§ 1202.45).  As we have addressed in part I., *ante*, we remand to allow the trial court to clarify its imposition of these fines, and we direct the trial court to then correct the abstract of judgment accordingly.

## DISPOSITION

We remand for the trial court to clarify its imposition of the sections 1202.4 and 1202.45 fines.  The trial court is also directed to correct the abstract of judgment to reflect the corrected imposition of those fines, as well as correct the abstract of judgment to properly reflect the punishments on count 1 and 3, as addressed herein.  The trial court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


FRANSON, J.

WE CONCUR:


LEVY, Acting P. J.


POOCHIGIAN, J.

43.